IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                      Criminal No. 08-MJ-2256

CHRIS L. ROMERO,

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS

THIS MATTER came before the Court on a bench trial conducted on February 4, 2009 before the undersigned Chief Magistrate Judge. Defendant Chris L. Romero ("Romero") is charged with a violation of 18 U.S.C. § 1152, crime in Indian Country; and 18 U.S.C. § 113(a)(5), for allegedly assaulting Blue Flower Keene on or about September 3, 2008, within the exterior boundaries of the Ohkay Owingeh Pueblo, New Mexico.

### Findings

1. Blue Flower Keene ("Keene") is an enrolled member of the Ohkay Owingeh Pueblo, previously known as the San Juan Pueblo.

2. Chris Romero is a non-Indian. He is not an enrolled member of any Indian tribe, and does not have any degree of Indian blood.

3. Keene and Romero were involved in a relationship for approximately ten years. They lived together for five and one-half years, and most recently, for three years in a mobile home located on Indian land within the exterior boundaries of the Ohkay Owingeh Pueblo.

4. The relationship between Keene and Romero produced three children, whose ages are currently 9, 7 and 4½.

5. On September 3, 2008, Romero suspected that Keene, his domestic partner, was involved in a secret relationship with someone else. He confronted her. Keene told Romero that she wanted to end their relationship and wanted Romero to leave the residence. Romero became angry and abusive, calling Keene "stupid" and a "bitch" and engaged in other verbally assaultive behavior.

6. Keene alleged that, in his anger, Romero picked up and threw hangers, children's toys, and shoes at Keene. This allegation does not appear in any of the written or oral statements Keene gave to investigating officers or to tribal courts.

7. Keene tried to get away from Romero and went into their bedroom. Romero followed her into the room and, with his cell phone, called his mother, told her that Keene was breaking up their relationship, and asked his mother to talk to Keene. While Keene was on the phone, Romero extended his arms and pushed her backwards onto the bed, balled his fist, and began striking Keene on her upper left arm. Keene dropped the phone and yelled at Romero, "Let me go!" He continued yelling even more loudly, verbally assaulting her, and hitting her.

8. Keene estimates that Romero hit her with a closed fist at least five times, but on other occasions, she has given different estimates. Romero suddenly stopped, got off Keene, began grabbing his clothes from the closet and putting them in a box.

9. While Romero was involved in this activity, Keene gathered their three children, left the house, and walked to her aunt's residence, which is located within close proximity to the parties' residence.

10. Arriving at her aunt's house, Keene called her mother and reported what was occurring. She also called Alan Cordero ("Cordero"), likewise advising him what was happening. She asked if she could borrow money from Cordero to change the locks at the parties' residence.

11. Cordero, Romero and Keene had been friends for a significant period of time. Indeed, Cordero called Romero his best friend. They were co-employees and spent a significant amount of time together. Romero referred to Cordero's mother as "mom," and Cordero referred to Romero's mother as "grandma." Cordero often spent the night at the Romero residence, and was close to Romero, Keene and the Romero children. Cordero often picked up or took Romero to and from work.

12. Some three weeks or so before the incidences that give rise to the criminal charges, Romero suspected that it was Cordero with whom Keene was secretly and romantically involved.

13. Both Cordero and Keene deny having an "affair" or being romantically involved prior to September 3, 2008. However, Cordero identifies Keene as his girlfriend and Keene is now pregnant with Cordero's child. The onset of pregnancy is traced to early September 2008, at, near, or even before the September 3 incidents.

14. The Court finds Keene and Cordero's testimony incredible that they were simply friends and not involved in any romantic relationship prior to September 3, 2008.

15. Sometime after Cordero arrived at Keene's aunt's house to pick up Keene and the children, they went to Wal-Mart to purchase new locks for the house so as to prevent Romero from returning to the parties' home. They then went to retrieve Cordero's tools from Cordero's residence in El Rancho.

16. Cordero, Keene and the children returned to Keene and Romero's home, and Cordero began changing the locks while Keene bathed the children and got them ready for bed. Keene asked Cordero to stay the night.

17. During the lock-changing process, the front door handle was removed and the front door was inoperable. Cordero and Keene heard a noise outside. A few moments later, the livingroom window was broken and Romero was seen entering the livingroom through the broken window.

18. During the process of either breaking the window or entering the residence, Romero cut himself on the broken glass and suffered a significant gash on his forearm, which began bleeding profusely.

19. Upon Romero's entry into the livingroom, he asked of Cordero, "What the f____ are you doing here?" Romero was angry and verbally abusive. He demanded to know where the children and Keene were. Romero went to the children's room and saw they were asleep, and then demanded to know where Keene was.

20. Keene took refuge and hid in the utility room at the end of the hall.

21. As Romero began to move toward the rear of the house, Cordero sought to restrain him. Romero punched Cordero on Cordero's left ear. The punch was with a closed fist and sufficient in strength to draw blood.

22. As Romero was trying to make his way into the utility room to get at Keene, a struggle ensued between Romero and Cordero. During the struggle, Romero pulled out a Leatherman multi-function tool and was trying to open the blade. Cordero sought to stop him from doing so. Unable to open the blade, Romero used the Leatherman tool to poke at Cordero. Cordero knocked the Leatherman from Romero's hand.

23. Romero retreated to the kitchen and grabbed a butcher knife from a utensil cup on the stove. Armed with the knife, Romero jabbed at Cordero. During the course of that struggle, Cordero's hands were cut. Romero's profuse bleeding resulted in a considerable amount of blood

dripping throughout the house.

24. Romero also tried to jab or poke at Keene with the knife while Keene was in the utility room and backed up against the washer. Cordero grabbed and squeezed Romero's lacerated arm. The pain caused Romero to drop the knife.

25. Cordero testified that there was blood everywhere, and it was so slippery, he was unable to maintain a hold of Romero.

26. During the altercation, Romero also grabbed a Stanley screwdriver and held it menacingly in his hand, but later dropped it without touching either Cordero or Keene.

27. Ultimately, Cordero was able to knock Romero to the floor, and while atop of Romero, Cordero called out for Keene to call the tribal police.

28. Keene stepped over the two men who were fighting on the floor, grabbed Cordero's cell phone and called her father, who apparently, in turn, called the police.

29. Romero was able to push Cordero off of him and moved toward the livingroom where Keene was now located. Cordero tackled Romero and, this time, was able to hold him down on the couch with an arm hold. While doing so, headlights shown through the window, and believing the headlights were from the police, Cordero released Romero. The headlights, however, were from Keene's father's car.

30. Moments later, tribal police, with emergency lights flashing, drove up to the residence, and upon seeing the flashing lights, Romero escaped through the rear door in the utility room.

31. Tribal police investigated, but because Romero was a non-Indian, did not think tribal courts had jurisdiction. So, too, the New Mexico State Police questioned their jurisdiction because the incident occurred on tribal lands, and, consequently, declined prosecution.

32. Special Agent J. P. Montowine, of the Federal Bureau of Indian Affairs, was contacted several days later by a domestic violence support group. He interviewed Cordero and Keene. On September 11, 2008, eight days after the incident, he observed and photographed significant bruising on Keene's left upper arm.

33. From the date of the incident until Special Agent Montowine's investigation, no one occupied the residence. Keene and her children moved temporarily into a relation's residence.

34. Upon Special Agent Montowine's arrival at the residence, he saw blood "pretty much everywhere," on the carpet, couch, wall, floor and the table. Montowine found broken glass from the westside livingroom. He also saw the entertainment center pushed in front of the window, which was covered with cardboard.

35. While at the residence, he retrieved a Stanley screwdriver, which he found under the table. Cordero pointed out the weapons in the kitchen, which included the butcher knife and the Leatherman multi-use tool, both of which had stains of what appeared to be blood.

36. Theresa Baca, Romero's mother, confirmed receipt of a September 3 telephone call, but claimed there was no indication of any emergency or altercation. Mrs. Baca said there were no thumps, bumps or yelling that could be heard, and she denied Keene told her she was being beaten by Romero.

37. The parties stipulated that the location where the event occurred, and which is the subject of the Information, is located within "Indian country," as defined in 18 U.S.C. § 1151 and 1152, and in the District of New Mexico.

38. Romero testified on his own behalf. He contends that when Keene told him that their relationship was over, he was only saddened and disappointed, but not angry. He contends that

Keene helped him pack his clothes and called a friend to give Romero a ride to a relative's home. He contends that there was no altercation, no punching, throwing of objects, or verbal or physical abuse. Essentially, he denies the totality of Keene's testimony. Romero's testimony is not credible, nor is it supported by other physical evidence.

39. Simple assault occurs by striking, beating or wounding an individual. It requires a physical touching. Under common law, simply assault also requires that the touching occur in a rude, insolent or angry fashion.

40. The Court finds by competent, admissible evidence and beyond a reasonable doubt that, on September 3, 2008, in Indian country, Chris Romero did assault Blue Flower Keene by pushing and punching her.

## Conclusions

The Court concludes:

1. that it has jurisdiction over the parties and the subject matter;

2. that the elements of simply assault, as outlined in United States v. Bruce, 458 F.3d 1157, 1162-63 (10th Cir. 2006), *cert. denied*, 549 U.S. 1141 (2007), have been proven by the United States by competent, admissible evidence, and beyond a reasonable doubt.

3. that there is no legally justifiable excuse for Romero's assaultive behavior, and even if his domestic partner, Keene and his friend, Cordero, were engaged in a personal or romantic relationship, that relationship does not justify or excuse the assaultive behavior; and,

4. that Romero is guilty as charged.

                                                                  *Lorenzo F. Garcia*
                                                                  Lorenzo F. Garcia
                                                                  Chief United States Magistrate Judge